# Exhibit A

# Actors' Equity Association

## AGREEMENT AND RULES GOVERNING EMPLOYMENT UNDER THE EQUITY/LEAGUE PRODUCTION CONTRACT

Effective Date: September 30, 2019

Expiration Date: September 25, 2022

**NATIONAL OFFICE**
165 West 46th Street
New York, NY  10036
(212) 869-8530 phone
(212) 719-9815 fax

**HOLLYWOOD OFFICE**
5636 Tujunga Ave
North Hollywood, CA  91601
(323) 978-8080 phone
(323) 978-8081 fax

**CHICAGO OFFICE**
557 West Randolph St
Chicago, IL  60661
(312) 641-0393 phone
(312) 641-6365 fax

**ORLANDO OFFICE**
10319 Orangewood Blvd
Orlando, FL 32821
(407) 345-8600 phone
(407) 345-1522 fax

www.actorsequity.org

This Agreement is made between Actors' Equity Association (hereafter called "Equity") and The Broadway League (hereafter called "League") on behalf of its Producer members (hereafter referred to individually as "Producer").

## RECOGNITION

The Producer agrees to recognize Actors' Equity Association as the exclusive bargaining representative of all the Actors (Principals, Chorus, Extras, Stage Managers and Assistant Stage Managers) employed by them, for the purpose of collective bargaining and the administration of matters within the scope of this Agreement.

## RULES GOVERNING EMPLOYMENT
## UNDER THE EQUITY/LEAGUE PRODUCTION CONTRACT

1. **ACTOR'S OBLIGATION TO EQUITY**

   (A) Nothing contained in any employment contract signed by any member of Equity shall be construed so as to interfere with the carrying out of any obligation which a member owes to Equity by virtue of such membership and the Producer shall not only not request or require any member to do any act or thing forbidden by the Constitution and By-Laws of Equity or by the rules or orders of the Council of Equity, or orders of its authorized executives, but will require the Actor to do and/or assent to the Actor doing any and all acts required by the foregoing.

   (B) The Producer further agrees that Producer has notice:

   (1) That the Associated Actors and Artistes of America is a voluntary Association hereinafter referred to as the "4 A's" and is subject to the Constitution, By-Laws, rules, regulations and orders of the American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), from which it derives its charter.

   (2) That Equity, deriving its charter from the "4 A's", is in turn subject to the Constitution, By-Laws, orders, rules and regulations of the "4 A's" and the American Federation of Labor-Congress of Industrial Organizations.

   (3) That the Actor is directly subject to the Constitution, By-Laws, rules, regulations and orders of the "4 A's" and the Producer agrees that Producer will not require the Actor to do any act or thing forbidden by the Constitution or By-Laws of the "4 A's" or by its rules, orders, or regulations.

   (4) All individual contracts of employment shall be subject to all such rules and regulations.

   (C) Nothing contained in this Rule shall require the Producer to take any action which is not legally permissible, or shall permit Equity to change, modify, amend, supersede, or impose any conditions or obligations upon the Producer which are not specifically set forth in the Equity Rules Governing Employment or in the basic collective Agreement or in any individual Agreement made with an Actor consistent herewith.

2. **AGENTS**

   (A) **Equity Franchise Required**. The Producer has notice that if the negotiations for, or the obtaining of, this contract by the Actor is through any employment agent or personal representative not holding an Equity Franchise or one whose Franchise is not in good standing, the Actor is liable to suspension or other disciplinary action.

   (B) **Commissions**. Should the Producer contact the Actor directly and agree with the Actor as to the salary and role, the Producer shall not directly or indirectly require an Agent to intervene to complete the engagement or require the Actor to sign the contract at or through an Agent's office. Any such Agent so engaged does not represent the Actor and should such Agent make a claim for commission, the Actor will notify the Producer

any other employment and to render Actor's services exclusively to the Producer and not to render services to any other person or corporation, without the written consent of the Producer. The Actor shall recognize that it is Actor's responsibility to perform under Actor's Equity contract in the legitimate theatre. If during the term of Actor's employment under Equity contract, a Principal Actor receiving star or featured billing is also employed in radio or television, Actor shall require as a condition of that employment, where the radio or television program is shown or heard at the same time that the Actor will be appearing in the legitimate production, that any advertisements, written or otherwise, which publicize Actor's appearance on radio or television must expressly mention that Actor is currently appearing in the legitimate production.

### 29. EXTRAS

Producer may employ Extras so long as the Extras comply with the following definition:

(A) **Definition**. The function of an Extra is to provide atmosphere and background only. An Extra may not be identified as a definite character, either singly or within a group and may not be required to change make-up. An Extra may, however, make a single costume change. An Extra may not be rehearsed more than two weeks before the first public performance, may not speak except *in omnes*, may not sing (except with the consent of Equity in relation to a particular play), dance, or understudy and may not tour except with a pre-Broadway tryout of eight weeks or less.

(B) **Auditions**. When a Producer determines to conduct auditions for Extras, such auditions shall be conducted consistent with the provisions of Rule 5(A), Principal Interviews/Auditions, provided, however, that there shall be no required minimum number of audition days, and performers may be screened for general type during the scheduled audition.

(C) **Salary and other conditions of employment**. Rehearsal and Minimum Performance Salary shall be no less than one-half Actor's minimum salary. During a pre-Broadway tryout, Extras shall be paid the applicable out- of-town expenses set forth in Rule 63(C) for each day spent out of town, in addition to their regular salary. Extras shall receive hospitalization and medical coverage as provided in Rule 0.

   (1) Rehearsal hours for the first two weeks after the Point of Organization opening may be the same as those for Principal Actors, as provided in Rule 58, REHEARSALS. After said two weeks, Extras shall be paid the rehearsal overtime rate (see Rule 58(D)(3)) per hour for any hour or part thereof of rehearsal.

   (2) Extras shall be signed on Standard Form Contracts supplied by Equity, which Standard Forms shall stipulate:

      (a) A one week guarantee of salary from the date of opening of the play;

      (b) A requirement of one week notice for termination of contracts.

### 30. GUARANTEED PERIOD OF EMPLOYMENT

If Actor's contract specifies a guaranteed period of employment or a notice of termination greater than two weeks, said greater period shall be substituted for two weeks where used in these Rules. However, under Rule 69(A)(2), the notice period under Standard Minimum Contract may not exceed four weeks. The guaranteed performance period for temporary replacements may be one week, provided that the engagement under the temporary contract is for one week of performances exclusive of the rehearsal period. (See also Rule 54, PREVIEWS.)

### 31. HEALTH FUND

(A) For all productions except Tier B, C and D Tours (see Rule 70(B)(2)(b)), the Producer agrees that the contribution rate for League/CBP Producers to the Equity-League Health

      Trust Fund, payable per week per Actor, shall be the negotiated rate effective as of September 28, 2015.

      The contribution rate is inclusive of a contribution for Supplemental Workers' Compensation Disability benefits administered by the Fund.

  (B) This contribution is not refundable in whole or in part.  The Health benefits afforded shall be determined by the Trustees of the Fund and shall include, but shall not be limited to, medical and hospital benefits.

  (C) Contributions are payable and begin to accrue on the first day of employment hereunder.

  (D) The Producer further agrees to be bound by the Agreement and Declaration of Trust establishing the aforesaid Health Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto which may be adopted by its Trustees during the term of this Agreement.

  (E) As provided for in Rule 49, PENSION FUND AND 401(k) PLAN, the annual net tax relief surplus in excess of the pension and 401(k) contributions required under that Rule, up to a maximum of $3,325,000 per year, shall be allocated to the Equity-League Health Trust Fund, and shall be designated as current income to the Health Trust Fund to defray actual operating expenses and not for reserves.

## 32. HOTEL RESERVATIONS

  (A) The Producer shall be responsible for securing hotel reservations and shall furnish Actor with an up-to-date list of no less than two available hotels for single and double occupancy at different price ranges.  The Producer shall request of each hotel that free internet access be provided to the Actors.  For stays in a city for four weeks or more, or where a Tiered tour stays in a city for more than four weeks, the Producer shall provide an unofficial third housing option that will include a kitchen, unless another housing option includes a kitchen.  Responsibility for hotel accommodations shall include ensuring that, to the extent there are vacancies, hotel accommodations are available for each member of the cast in each hotel regardless of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status or political persuasion or belief.  When hotel accommodations are limited, assignments shall be made pursuant to a lottery system, subject to the contractual housing guarantees of any Actor.  A lottery will not be necessary where there is no dispute in the company regarding the hotel accommodations. The lottery may consist of all members of the traveling company including, but not limited to, traveling Stagehands, Wardrobe and Musicians.

    (1) Two weeks prior to the play date, the advance agent or company manager shall submit such list to the Actor.  In addition, a copy of the list provided to the Actor shall be sent to Actors' Equity Association.

    (2) Within one week thereafter the Actor shall indicate the Actor's acceptance, or the Actor's preference to arrange for Actor's own accommodations.  Unless the Actor notifies the company manager of acceptance of such accommodations, the Producer shall be relieved of further responsibility.

  (B) If the Actor has complied with the requirements of (A) above and does not receive accommodations upon arrival, Actor shall not be required to rehearse or perform until such accommodations are forthcoming.

  (C) If the Actor refuses to accept accommodations that Actor has requested and obtained through the Producer, Actor shall pay for one night's accommodation.

  (D) Due regard shall be given to obtaining such accommodations within a reasonable distance of the theatre and that the same shall be clean and sanitary.  When a show is not playing at its own Point of Organization and the theatre is more than one-half mile from the hotel, transportation to the theatre and return after the performance will be furnished at the Producer's expense.

        participating in a scene where any Actor appears nude, or performs acts of a sexual nature, on a fully executed Equity Nude Photograph/Video Release form. The Producer shall file a copy of the fully executed release form for each Actor with Equity.

      (b) An authorized Actors' Equity Association representative must be present at all such photographing, filming or videotaping.

  (5) Actor shall not, while nude, mix with the audience or leave the stage, backstage or performance area. The Producer shall take all necessary measures to insure that no member of the audience will be permitted to enter the stage, performance area or backstage while any Actor is nude.

  (6) Artists' renderings of nude Actors shall not be permitted without the Actor's prior written consent.

(C) IF THE PRODUCER BREACHES ANY OF THE ABOVE PROVISIONS THE PRODUCER SHALL BE ASSESSED DAMAGES OF NO LESS THAN ONE WEEK'S CONTRACTUAL SALARY FOR EACH VIOLATION OF ANY OF THE PROVISIONS SET FORTH ABOVE IN PARAGRAPHS (A) OR (B) FOR EACH ACTOR INVOLVED.

(D) All of the above shall not preclude the Actor or Equity from instituting any civil action in addition to the damages set out in this rule.

## 47. NUMBER IN CAST

(A) The number of Chorus employed on the first day of rehearsal may not be reduced in number under any circumstances.

(B) The number of Principals and Stage Managers employed may not be reduced in number under any circumstances after the Official Opening at the Point of Organization, or after the first paid public performance of a Road Tour.

(C) The Producer may employ Stage Managers beyond those required by Rule 68, STAGE MANAGERS, on temporary contracts, without affecting the provisions of Rule 47, NUMBER IN CAST. The additional Stage Managers may be employed until four weeks after the Official Opening at the Point of Organization, or four weeks after the first paid public performance of a Road Tour.

## 48. ORGANIZATION POINT

(A) The Producer shall have the right to designate the Point of Organization as either New York, Los Angeles, San Francisco, or Chicago, which Point of Organization shall be designated on the face of the contract. In the case of any other city, Equity shall have the right to designate the Point of Organization.

(B) Once designated, the Point of Organization shall remain the same for the life of the company. The Producer shall have the right to designate New York, Los Angeles, San Francisco, or Chicago as the Point of Organization of other Companies of the same production.

(C) The Company shall cease to exist upon the expiration of the period set forth in Rule 59, REOPENING OF A PLAY.

See also Rule 70, TOURS, for tours performing at the city designated as the Point of Organization.

## 49. PENSION FUND AND 401(k) PLAN

(A) The Producer acknowledges that the collective bargaining agreement effective June 1, 1960 between Equity and the League provides for the establishment of a jointly administered Pension Fund. The Producer agrees to abide by all provisions of said agreement with respect to said Pension Fund, including the obligation to make the contributions called for therein and to execute all necessary documents accepting the Agreement and Declaration of Trust establishing said Pension Fund and to be bound by

all rules and regulations of said Pension Fund now or hereafter adopted or which may from time to time be adopted by those administering said Fund.

(B) The agreements applicable to the establishment and administration of the Equity-League Pension Fund are renewed and extended for the duration of the collective bargaining agreement between Equity and the League, as amended by the Amendments to the Equity-League Pension Agreement effective June 28, 1971. The terms and conditions contained in the Arbitration Award of Burton Turkus dated April 23, 1963 are continued except as amended and modified in accordance with the recommendations contained in the letter of Morris Tarshis, Chief Labor Mediator for the City of New York, dated February 15, 1965 and as amended by the parties hereto.

(C) The Producer shall pay to the Equity-League Pension Fund 6% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder. In lieu of the foregoing, and in addition to the contribution provided for in Rule 49(F), for Canadian Actors whose primary designated fund is the Canadian Actors' Equity Association Registered Retirement Savings Plan, the Producer shall contribute to the Equity-League 401(K) Trust Fund 6% of all monies received weekly, exclusive of the minimum out-of-town expense reimbursement and up to a maximum of $7,500.

(D) The Producer shall continue to allocate for pension purposes, for the benefit of the employees hereunder, that share of the net tax relief from the repeal of the New York City Amusement Tax on theatre ticket admissions that has heretofore been determined. The allocation shall be used to satisfy the obligation of Producer to make the payments specified in paragraph (C) of this Rule, provided, however, that the amounts so allocated are equal to, or in excess of, the payments required under paragraph (C). It is distinctly understood and agreed that in no event shall Producer pay less than the amounts specified in paragraph (C).

(E) It is understood and agreed that the Producer's obligation to pay the allocation shall be deemed also an obligation of the theatre owner or operator and that this obligation is in no way reduced, modified, or limited by the fact that such theatre owner or operator may or may not be a charitable foundation or other organization ordinarily exempt from payment of taxes. It is further understood and agreed that the theatre owner or operator shall make suitable contractual arrangements when leasing the theatre to a Producer of an attraction, to see that the intent and purpose hereof is carried out, i.e., that the full allocation of the net tax relief, ordinarily available by reason of the repeal of the New York City Amusement Tax on theatre ticket admission, shall be paid without any exception resulting from a possible claim of a Producer or theatre owner that it should not make such payments by reason of the fact that it would not have been subject to the tax because of the status of the Producer or theatre owner as a Charitable Foundation or other exceptional entity.

(F) Effective October 1, 2019, the Producer shall contribute 4% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder to the Equity-League 401(k) Trust Fund on behalf of each such employee. This contribution for Producers able to utilize tax relief shall be made as follows:

(1) A contribution equal to 1% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder shall be made by the Producer; and

(2) Effective October 1, 2019, a contribution equal to 3% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder shall be made by allocating an equivalent amount of the net tax relief surplus in excess of the Producer's pension obligations under (C) above to the 401(k) Fund.

The specific terms and conditions of the Plan will be made available to all eligible Actors.

(G) The annual net tax relief surplus in excess of the pension and 401(k) contributions required under this Rule, to a maximum of $3,325,000 per year, shall be allocated to the Equity-League Health Fund, and shall be designated as current income to the Health Fund to defray actual operating expenses and not for reserves.

(H) In addition, annual net tax relief surplus in excess of the amounts in (F)(2) and (G) will be applied to defray the per-participant administrative charge of the Equity-League 401(k) Trust Fund, subject to a maximum of $50,000 per month. Such use shall be monitored by the League and Equity along with the Fund's trustees, and shall be reduced (or eliminated) to the extent the administrative expenses of the Fund are offset by reimbursements from the Fund's vendor.

(I) The Producer agrees to be bound by the Agreement and Declaration of Trust establishing the Equity-League 401(k) Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto that may be adopted by its Trustees during the term of this Agreement.

### 50. PERFORMANCES

(A) **Number of**.

(1) A maximum of eight performances shall constitute a week's work which may be given during a period of not more than six out of seven consecutive days. A week's compensation shall be paid even if less than eight performances are given in any week, provided that if the first paid public performance is on any night but Monday, payment to the Actors for that part of the week in which the first public performance occurs shall be for such number of performances actually performed. In no event shall an Actor receive less than the minimum performance salary for the week (inclusive of any rehearsal salary an Actor receives for the period preceding the first paid public performance). In the week of a production's closing, Actor shall be paid no less than one-sixth of contractual salary for each day employed, excluding the day off, but in no event less than one-eighth per performance so long as the proper closing notice has been given. (See Rule 45, NOTICES.)

(2) Not more than five performances may commence in any three consecutive calendar day period without the consent of Equity, which consent will not be unreasonably withheld. (See Rule 70(F)(3), TOURS, regarding the number of performances in three days on tour.) However, six performances may commence in any three consecutive calendar days under the following conditions:

(a) A six-in-three day schedule may not occur more than 12 times during each 12-month period beginning with the first six-in-three day schedule, without the consent of Equity, which consent shall not be unreasonably withheld.

(b) At least six weeks' notice must be given to the company, with a copy to Equity, unless the Producer obtains the consent of Equity for a shorter notice period, which consent shall not be unreasonably withheld.

(c) Actors shall receive one day off in addition to the required day off. Either the additional day off or the required day off must occur immediately following the third day of the six-in-three schedule. In the event the six-in-three day schedule occurs over two workweeks, there shall be at least two days off in one of the two affected workweeks, but in all instances, there shall be one day off immediately following the six-in-three day schedule. Should there be more than two consecutive weeks with a six-in-three day schedule, the Actor must receive two consecutive days off immediately following the second and each subsequent six-in-three day schedule, except that there need only be one day off immediately following the six-in-three day schedule when the performance schedule reverts to no more than five performances in any three consecutive days.

(d) The Producer shall use best efforts not to schedule promotional or publicity calls on the days off.

## DURATION

This Agreement shall commence on September 30, 2019 and expire on September 25, 2022. Any new rules, when adopted, shall be retroactive to said commencement date unless otherwise stated.

Consistent with the parties' agreement to create a unified touring agreement, the application of this Agreement to National and Tiered tours expires on November 1, 2020, but the "status quo" concerning those tours shall be maintained as required by law.

All individual contracts of employment existing or signed on or subsequent to said date shall be modified in accordance with the new rules. Equity may advise its members that no Actor shall work for the Producer unless an Agreement and Rules Governing Employment under the Equity/League Production Contract is in effect.

NOTE: The sub-headings for each of the foregoing provisions have been inserted for convenience and are not to be deemed as part of the provisions to which they refer. The Table of Contents and the Index are likewise added for convenience and are not to be deemed a part of this Agreement.

_Mary McColl_
ACTORS' EQUITY ASSOCIATION
by Mary McColl
Executive Director

10/8/2021
Date

_[signature]_
THE BROADWAY LEAGUE
by Scott Irgang
Director of Labor Relations

10/8/21
Date